THE CITY OF RENO, A MUNICIPAL CORPORATION, APPELLANT, *v.* J. W. VAN ERMEN, INDIVIDUALLY AND AS GUARDIAN AD LITEM FOR JOAN VAN ERMEN, A MINOR, RESPONDENT.

No. 4612

October 7, 1963      385 P.2d 345

*Vargas, Dillon & Bartlett,* and *Alex. A. Garroway,* of Reno, for Appellant.

*Peter Echeverria,* of Reno, for Respondent.

## OPINION

By the Court, McNamee, J.:

In this case the City is charged with maintaining in a "negligent, reckless and careless manner" Airport Road in the City of Reno in that it erected and raised a barricade on the road without adequate warnings, thereby creating a hazard to vehicles; that on April 9, 1960, as a result of such negligence, a Mercury sedan driven by Gary Cooper, in which Joan Van Ermen was a passenger, did strike said barrier with resulting injuries to Joan Van Ermen.

The case was tried before a jury. After all the evidence had been introduced by both sides the City moved for a directed verdict, which motion was denied. The case was submitted to the jury which brought in a verdict for the City. Judgment was entered upon said verdict. Thereafter plaintiff's motion for a new trial was granted. The trial court's formal findings of fact recite:

1. There was a manifest disregard by the jury of the court's instructions upon the law.

2. The evidence is insufficient to justify the verdict and clearly preponderates against the verdict.

3. The verdict is against the law.

4.   That upon all of the facts and circumstances of this case, the court, after hearing the trial, reviewing the exhibits and considering all of the evidence is clearly satisfied that an injustice has been done and that to allow the verdict and judgment to stand will result in a miscarriage of justice.[1]

Thereupon, the lower court set aside the verdict, vacated the judgment, and ordered a new trial.

Appeal is from the order granting the motion to set aside the verdict and judgment and for new trial.

On this appeal we are in no manner concerned with the medical testimony or the extent of the plaintiff's injuries. We are concerned only with evidence pertaining to the negligence of the City and the proximate cause of the accident. A review of the entire evidence pertaining to negligence and proximate cause is therefore required.

The following evidence is undisputed:

At about 7:15 p.m., on April 9, 1960, Gary Cooper, age 22, and Joan Van Ermen, age 17, left Joan's home and drove in his Mercury easterly on Airport Road from Kietzke Lane toward the airport area and crashed into the earth and asphalt debris barrier, going through and over it, coming to a stop about twenty feet away. He was killed and Joan was severely injured. In hitting and going over the barrier the vehicle caused a break in the center of the barrier and scattered debris approximately 100 feet eastward. Joan remembered nothing of the accident. Prior to September 26, 1959 the Reno Municipal Airport buildings were located at the eastern end of Airport Road where the road terminated and did not connect with any other public thoroughfare. On September 26, 1959 the buildings were abandoned because new airport terminal facilities north of the old site were put to use and the old buildings razed in November 1959. Thereafter there was no need for continued use of that end of Airport Road. Nevertheless, automobiles frequently were driven to the end of the road and onto the landing field creating a hazard to

---

[1]This is not one of the statutory grounds for granting a new trial.

planes. In an endeavor to stop such practice, wooden portable barriers were placed across the road and a heavy wire cable joined to them. Burning smudge pots were placed nearby. These were not effective to stop the practice of automobiles going upon the landing field. In March 1960 a permanent barrier was erected consisting of dirt and chunks of asphalt paving. The barrier was 30 feet long all the way across the road, 10 feet thick at the bottom, about 6 feet high, and was located some 700 feet west from the end of the road which terminated at the edge of the landing field. Three pieces of pipe were inserted vertically in the barrier anchored in concrete, one at each end and the third in the center, to each of which was attached a metal reflector with an additional bullseye on the center pipe. The reflectors were orange or amber in color and could be seen 300 to 500 feet away. The majority of installations for dead-end streets in Reno were the same as that on Airport Road. Beyond the barrier eastward there were some lights on the landing field runways, both to the left and right of the reflectors on the barrier. East of Kietzke Lane and some distance west of the barrier the City had erected at different locations two road signs of standard size, one stating "NOT A THROUGH STREET," and the other, "DEAD END STREET." The road also was visibly posted with at least one 35-mile per hour speed limit sign, which was the speed limit in effect on that road at that time. Joan Van Ermen knew at the time of the accident that the Airport Road had a maximum 35-mile per hour speed limit and also knew that the Airport Road was not a through street.

Joe Hicks, called as an adverse witness on behalf of the plaintiff, testified that he was the Airport Manager for the City of Reno; that after dark, one could see the posted signs at a distance of 200 feet without difficulty, and that the reflectors on the metal pipes, as well as the red bullseye on the center pipe, would loom up in the headlights of an oncoming car when it was 400 to 500 feet away. In driving down Airport Road, Hicks testified he had no difficulty in distinguishing the reflectors on the barricade from the runway lights on the airfield.

Robert E. Callahan, a witness for the plaintiff, testified that he was Street Supervisor for the City of Reno at the time of the accident; that as one drives down Airport Road the runway lights on the north-south runway would be 35 feet to the right and 90 feet to the left from the center line of an elongation of Airport Road, and would not face the road toward the west.

Roger Newton, a witness for the plaintiff, testified that he visited the scene of the accident on April 10, 1960, at 10:00 p.m., and as he traveled easterly on Airport Road he could see the clearance lights on the runway approximately from where Neil Road entered Airport Road; that the reflecting lights on the iron posts that were on the barricade appeared to be on approximately a horizontal line with the runway lights; that he could observe three red lights at the easterly portion of the runway; that he could see the sign, "NOT A THROUGH STREET," 200 feet west of it; that it was clearly visible; and that he could see the "DEAD END" street sign at a distance of 200 feet. He was specifically watching for the reflectors on the barricade and saw them 300 to 350 feet away; that when he got approximately 300 feet from the barrier he could clearly see the position of the runway lights and the reflection of the lights of the barrier, but further than 300 feet he had difficulty determining the relationship between the lights; and that the runway lights were 4,000 to 5,000 feet beyond the barrier.

Margie Warner, a witness on behalf of plaintiff, testified that about two weeks prior to April 9, 1960, at dusk, she went east on Airport Road, and as she was driving along without her lights on, pointing out to her passenger where the airport buildings had been, "all of a sudden this barricade was in front of me." She didn't notice any warning signs as she approached. She was driving 15 miles an hour and was within 15 feet of the barrier before she saw it.

Carl Harris, a witness on behalf of the plaintiff, testified that when he heard of the accident he was at the Airport Bar, and proceeded to Airport Road, going probably 45 miles an hour. He didn't recall seeing any warning signs. The first lights he saw were the tail

lights of the car involved in the accident. They were out, but his lights caused a reflection. He did not see the reflectors on the barricade until he came to a halt. He received no warning from the reflectors on the posts at all because "they were too high for my lights to strike. I had my lights on low beam." He applied his brakes. His car skidded sideways into a sudden stop. There were lights on the immediate edge of the runway which he could see as he went out on Airport Road. He was 70 to 80 feet from the barricade when he saw it and applied his brakes.

After the plaintiff rested, the defendant without objection was permitted to file an amendment to his answer which set out the following two sections of the Reno Municipal Code.

Section 10–56 provides:

"Reckless Driving. It shall be unlawful for any person to drive or operate a vehicle of any kind or character in a reckless manner on any street, or highway or alley; or in other than a careful or prudent manner; or at a rate of speed greater than is reasonable and proper, having due regard for the traffic on, and the surface and width of the street or highway; or at such a rate of speed as to endanger the life, limb or property of any person; provided that the speed of the vehicle shall not exceed that provided in Article VI of this Chapter; and provided further that the mere fact that a vehicle is operated within the speed restrictions contained in Article VI of this Chapter will not constitute prima facie evidence that said vehicle was operated in a lawful manner."

Section 10–57 provides:

"Restrictions as to Speed.

"(a) Basic Rule. No person shall drive a vehicle upon a street or highway in violation of the provisions of Section 10–56 of this Chapter.

"(b) Indication of Maximum Speeds. No person shall drive a vehicle upon a street or highway in excess of that indicated as follows:

"(4) 35 miles per hour.

"(4a) Upon any street or highway marked and signed by the Chief of Police, with the approval of the City Council, when the marking and signing indicate the allowance of such speed."

George Barnes, a witness for the defendant, testified that he was affiliated with the University of Nevada as a professor of physics. After qualifying as an expert, he stated that a car traveling 35 miles an hour in and around Reno would travel 57 feet when the brakes were applied, or 106.4 feet between the initial reaction and the application of the brakes. During the 57 feet the car would be skidding. At 60 miles an hour the car would skid approximately 200 feet and the reaction distance before application of the brakes would be 66 feet. At 70 miles an hour the reaction distance would be 76.9 feet and the braking distance 260 feet. After viewing the exhibits showing the automobile and the barrier after the accident he testified that the car was traveling at least 50 miles per hour at the time it collided with the barricade.

Edward Fogarty, a witness on behalf of the defendant, testified that he and his wife frequently went out on Airport Road and parked near the barrier to take their dog out walking. On the night of the accident after walking the dog they had just gotten back into their car which was parked on the north side of Airport Road in front of the barrier facing west with his lights on low beam when the Cooper car went through the barricade. He first saw the Cooper car when it crossed the Neil Road intersection and paid little attention to it until it was 200 to 300 feet away. He estimated the speed of the Cooper car at the time it hit the barrier to be 70 to 80 miles an hour. It did not slow up nor were the brakes applied. It did not vary its course or slow down at all before hitting the barricade. He did not remember seeing any red bullseye reflector on a pole, but he did recall the orange reflectors on the poles. In going east on Airport Road he saw the sign "NOT A THROUGH STREET" at the Neil Road intersection, but he did not remember seeing a sign

reading "DEAD END STREET." In going out on Airport Road he could see, over the barrier, the landing lights on the field "right behind the end of the road there" quite a ways beyond the barrier. In exercising his dog he often saw cars drive up to the barrier, turn around, and go back. He never saw anyone come up to the barrier and suddenly apply his brakes either during the daytime or at night.

Richard Maxwell, a witness for the defendant, testified that he was the Air Traffic Controller on the night of the accident working at the airport control tower. He noticed a vehicle coming east on Airport Road and watched it while it traveled approximately a half mile. "I noticed the lights because they were much faster than the normal car." He estimated the speed of the vehicle between 70 and 80 miles per hour. He said to his companion in the tower, "Hey, Pete, look, it's going to hit it." When it got to the barrier the lights disappeared and he saw a cloud of dust or smoke. The car did not slow down prior to hitting the barrier. After the impact he went to the place where the car had come to a stop. There were lights on the runway, the emphasis of their direction being towards the runway. He had seen another car hit the wooden barricade sometime before.

J. W. Van Ermen was called as an adverse witness by the defendant. He admitted that in instituting this suit he had also sued the administrator of Gary Cooper and had alleged in the original complaint: "* * * and that GARY WILBUR COOPER was driving the 1957 Mercury sedan forward in a reckless, careless, wrongful and grossly negligent manner; that as a direct and proximate result of the recklessness, carelessness, wrongful, grossly negligent and unlawful conduct of GARY WILBUR COOPER, the said 1957 Mercury sedan struck the barricade which had been placed across the said road; that as a direct and proximate result of the striking Joan Van Ermen was severely injured."

Mario Frediani, a witness for the defendant, testified

that he was employed by the Reno Street Department. The pipes placed in the barricade were planted in concrete bases. The "NOT A THROUGH STREET" and the "DEAD END AHEAD" signs had yellow backgrounds with black lettering.

Alan Anderson, a witness for the defendant, testified that he was with the Reno Police Department as a traffic officer and that he went to the scene of the accident soon after it happened. There was no skid mark of any kind west of the barrier. The debris east of where the automobile came to a stop was scattered for approximately 100 feet.

Donald L. Rama, a witness for the defendant, testified that he was a traffic officer with the Reno Police Department at the time of the accident. He and officer Anderson checked Airport Road 150 to 200 feet before the barricade and found no skid marks at all.

Eugene C. Sprout, a witness for the defendant, after testifying that he was a professional civil engineer and after qualifying as an expert, stated that the warning lights on the ends of the runway were on poles 30 feet high, the lights were red, there were three sets, and that the poles themselves were 260 feet apart with a pair of lights on each pole. The lights could be seen from Airport Road, not individually however.

The only assignment of error is that the trial court abused its discretion in granting the motion for a new trial.

In granting the motion, the trial court did not specify which of its instructions the jury disregarded, or in what manner the verdict was against the law, or what injustice would result to allow the verdict and judgment to stand. As to the remaining ground for granting the motion, to wit, that the evidence was insufficient to justify the verdict, we must scrutinize the evidence to ascertain whether the evidence was of such a nature that in setting aside the jury's verdict and the judgment based thereon, the trial court abused is discretion.

If we should determine that the court abused its discretion in granting a new trial on this ground, it necessarily follows that the verdict was not against the law, that no injustice to the plaintiff would result from allowing the verdict to stand, and that the jury did not disregard the court's instructions.[2]

In Arrowhead Freight Lines v. White, 71 Nev. 257, 287 P.2d 718, this court stated:

"The law of Nevada regarding such an appeal is well digested in Nevada Rock & Sand Company v. Grich, 59 Nev. 345, 365, 93 P.2d 513, 521. The question is not whether we, as an appellate court, on the record before us would have reversed the jury's verdict as without evidentiary support. The question, rather, is whether upon that record the trial court can be said to have abused its discretion in granting new trial. As stated in Treadway v. Wilder, 9 Nev. 67, 70, 'It must be borne in mind that the nisi prius courts in reviewing the verdict of juries are not subject to the rules that govern appellate courts. They may weigh the evidence and if they think injustice has been done grant a new trial where appellate courts should not or could not interfere.' We must, then, respect not the jury's verdict but the trial court's judgment (that the evidence clearly preponderates against the verdict or that it would result in injustice) unless that judgment is clearly wrong."

It is apparent from a review of the evidence that it is in conflict with respect to the negligence of the City in the construction and maintenance of the barrier across Airport Road. If this was the only matter before us, it is clear from the earlier Nevada decisions that the discretion resting in the trial judge would empower him to set aside the verdict, if he felt the verdict resulted in injustice.

If, however, the negligence of the City, if any, was not a proximate cause of the accident, its negligence would have no significance.

From the admitted facts and the uncontradicted testimony, Gary Cooper at the time he hit the barricade was

[2]The record shows that the jury was properly instructed on all phases of negligence, proximate cause, and burden of proof.

driving at a speed between 70 and 80 miles an hour (witnesses Fogarty and Maxwell), or at a minimum of 50 miles per hour at the time he hit the barricade (witness Barnes). In driving in excess of 35 miles per hour Cooper was violating the law and was guilty of reckless driving under the city ordinances. The gross negligence of Cooper was alleged by respondent in his original complaint, and admitted by his counsel during oral argument. Aside from this, however, the record shows that Cooper failed to keep his automobile at such speed and under such control as to be able to stop it within the range of his vision. Had he complied with this requirement, there would have been no accident. In City of Miami v. Saunders, 151 Fla. 699, 10 So.2d 326, where the driver in exceeding the speed limit ran off the dead end of a street, the court said, "the driver was driving so rapidly when he discovered the street was a dead-end street he was unable to stop the automobile," and concluded that such negligence was the sole proximate cause of the accident.

The Supreme Court of California in Rodkey v. City of Escondido, 8 Cal.2d 685, 67 P.2d 1053, stated:

"A municipality is not bound to maintain its highways in a condition to preclude the possibility of injury or accident. It is not an insurer of the safety of travelers on its streets. The duty imposed upon it under the statute of 1923 (Stats. 1923, p. 675) is to exercise ordinary care to maintain its streets in a reasonably safe condition for their use in a proper manner. (Citations) It is not required to maintain the highway so as to insure freedom from accidents at every possible speed. The city has the same right as an individual to assume that the motoring public will obey the law and therefore will moderate its speed in passing through a residence district. The record shows, and the findings do not negative the showing, that the storm dip was safe for cars traversing it up to speeds of thirty or thirty-five miles an hour. Under the particular facts we must conclude that the city has met the requirements of its duty to the traveling public. Negligence on its part is not therefore shown. In such a case the question whether any negligence of the driver of the car is imputable to

the plaintiff cannot affect the result. If the driver had been proceeding with due caution he would have been aware of the nature of the district and of the construction of the highway and if he had restricted his speed accordingly no untoward result would have ensued. Under the circumstances presented on this record his negligence must be deemed the sole proximate cause of the injury to the plaintiff and the city cannot be held liable."

In Briske v. Village of Burnham, 379 Ill. 193, 39 N.E.2d 976, the charge against the city was that it failed to give adequate warning of the barrier it had erected. The court there said that if the negligent act or omission did nothing more than furnish a condition making an injury possible, and such condition, by the subsequent independent act of a third person, causes an injury, the two acts are not concurrent and the existence of the condition is not the proximate cause of the injury. "An intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury and itself becomes a direct and immediate cause of the injury."

The general rule is that a municipal corporation must exercise ordinary care to keep its streets in a reasonably safe condition for *ordinary* use by the public. Oklahoma City v. Baker, 195 Okl. 238, 156 P.2d 612. It is not required to keep its streets in a condition that protects the users from a use that is not ordinary. The ordinances required the drivers of automobiles on Airport Road to drive at a speed not to exceed 35 miles per hour or at a rate of speed not greater than is reasonable or proper under the circumstances. The conduct of Cooper was such as not to be expected from the ordinary use of the road.

Under our previous decisions, where we have held that the lower court had not abused its discretion in

granting a new trial, the district court either discovered an error of law committed during the trial which if uncorrected would necessitate a reversal on appeal, or in weighing the facts it had concluded that the jury's verdict was wrong and if undisturbed an injustice would result. Here it is not contended that any error of law occurred during the course of the trial. The lower court in granting the motion for new trial professed to exercise its discretion upon the facts. When it appears from the uncontroverted facts as a matter of law that the sole proximate cause of the accident was the gross negligence of Cooper, the trial court under such circumstances, in granting the motion for a new trial, did not exercise its discretion with respect to the facts but rather was ruling on a question of law. The ruling of the court therefore will be treated the same as a ruling upon any other legal question arising in the progress of the trial, and this court will determine its correctness independently of the judgment of the trial court. Barnes v. J. C. Penney Co., 190 Wash. 633, 70 P.2d 311.

The trial court having erred on a pure question of law in vacating the jury verdict and judgment based thereon and granting a new trial, it is the duty of this court to reverse the order. Every v. Every, 293 P.2d 612 (Okl. 1956).

The order appealed from is reversed, and the cause is remanded with directions to reinstate the verdict and judgment.

BADT, C. J., concurs.

THOMPSON, J., concurring:

The basis for a new trial, as expressed in NRCP 59(a) (7) perplexes me. If the words used, "insufficiency of the evidence to justify the verdict or other decision, or that it is against law," means the absence of substantial evidence to support the verdict, then the verdict should be set aside and judgment entered for the opposing party as a matter of law. Another

trial would be nonsense. On the other hand, if the words acknowledge that there may be substantial evidence to support the verdict, then it seems to me that the verdict should stand even though the trial judge may not like it. The present case places the problem in focus. The trial judge (correctly in my view) denied the motion of the City of Reno for a directed verdict based on the proposition that it was entitled to judgment as a matter of law. The judge believed that reasonable minds could differ regarding the city's alleged liability to plaintiff, and therefore ruled that the jury should decide the case. Yet, after the jury made its decision, the court set it aside (not because of a legal error, new evidence, misconduct, etc., which may have affected a fair trial, but rather because of his view of the evidence) and ordered the parties to do it all over again. The foolishness of it all is immediately apparent.

Presented with this problem in years past, this court on review of an order granting a new trial on this ground, NRCP 59 (a) (7), formerly 9385.52 (7) 1929 NCL, 1941 Supp., has attempted to evaluate the trial judge's action in terms of whether he "abused the discretion" granted him. The guiding principles are tabulated in Nevada Rock & Sand Co. v. Grich, 59 Nev. 345, 93 P.2d 513, and succeeding cases. Briefly it may be said that his discretion is properly exercised if he grants a new trial when the evidence preponderates *against* the verdict, but that an abuse occurs when the evidence preponderates in favor of the verdict. We are ill equipped to make such an evaluation. We can, with reasonable accuracy, search a record to ascertain if there is some substantial evidence to support a result. However, I seriously doubt our capacity on review to assert what evidence preponderates or is to be given the greater weight. Nor should the trial judge have that prerogative once having determined that the case is properly one for jury decision.

Precedent advises that when a case comes to us on appeal from an order on motion for new trial in a jury case, we must look to the decision of the judge—not

the jury verdict. Arrowhead Freight Lines v. White, 71 Nev. 257, 287 P.2d 718.[1] Yet we are in no position to decide whether an abuse of discretion has occurred until we first re-examine the facts presented to the jury to see if there is a preponderance for one side or the other. We cannot do this on a direct appeal from a judgment entered on a jury verdict. Being remote from the arena, we do not profess to have the capacity to weigh, sift and evaluate the evidence when the case comes to us in that manner. Why should the rule on review be different when the appeal is taken from the judge's order on a motion for a new trial? It seems to me that the same standards should apply in either instance. If the verdict rests on substantial evidence, it should stand; if it does not it should be set aside. Admittedly, the process of determining the existence of substantial evidence requires some evaluation on our part. However, it is a reasonably workable standard in most cases. On the other hand, I find it quite impossible from our vantage point to review a record and decide on which side the evidence preponderates. Yet such is our task under Nevada case law as it now exists. I believe that NRCP 59(a) (7), as a basis for granting a new trial, should be abolished as a hindrance to the efficient administration of justice. The other grounds for new

---

[1] Learned Hand expressed his disapproval when, on review of an order denying a new trial motion, he stated: "Moreover, while it might be well to give us the unconditional power to review such orders, we could not as things are exercise it freely. The most that has been said is that we may do so when there has been 'an abuse of discretion.' That is an impracticable rule, unless confined as it has always been confined save for Cobb v. Lepisto. The trial judge decides what verdict is within the bounds of reasonable inference from the evidence. That is a question which we can consider as well as he, and which we do upon his direction of a verdict. But by hypothesis we are not to be allowed to do that; we must come at the matter at one remove, and apply the same test to the judge's decision that he applies to the jury's. We must in effect decide whether it was within the bounds of tolerable conclusion to say that the jury's verdict was within the bounds of tolerable conclusion. To decide cases by such tenuous unrealities seems to us thoroughly undesirable; parties ought not to be bound by gossamer strands; judges ought not to engage in scholastic refinements." Miller v. Maryland Casualty Co., 40 F.2d 463.

trial set forth in NRCP 59(a) are sufficiently broad to permit the correction of an occurrence affecting the fairness of the trial.

Turning to the present case, I, too, believe that the trial court's order granting a new trial should be reversed. There is a mass of evidence from which the jury could rightfully conclude that the City of Reno was not liable to the plaintiff.