[Civ. No. 1681.   Fourth Appellate District.—November 6, 1937.]

E. S. BECKLEY et al., Respondents, v. VICTOR VEZU et al., Defendants; COUNTY OF SAN BERNARDINO (a Body Politic and Corporate of the State of California), Appellant.

Stanley Mussell, District Attorney, and Albert E. Weller, Deputy District Attorney, for Appellant.

Wilson & Coughlin for Respondents.

BARNARD, P. J.—This is an action for damages for personal injuries sustained by the plaintiffs when an automobile in which they were riding struck a bridge on Colton Avenue, which runs in a northerly and southerly direction, and is the main highway connecting the city of San Bernardino with Colton and Riverside.

Colton Avenue is sixty feet wide and for several hundred feet on each side of this bridge the city limits of San Bernardino run along the center line of the right of way, leaving the westerly half inside, and the easterly half outside, the city limits. However, this bridge and all parts of the paved portion of the highway which are material here were on the westerly half of the right of way and within the city limits. The bridge was about 180 feet long and about nineteen feet wide, the sides being steel arches which rose about ten feet above the surface of the pavement. The road was straight and level for several miles southerly from the bridge. Originally, the pavement southerly from the bridge was sixteen feet wide. In July, 1934, the county, at the request of the city, widened this pavement near the bridge by adding ten feet to the east side thereof, corresponding to what had been done on the road farther south. Two white lines were painted on the pavement dividing it into three lanes, which lines stopped 186 feet southerly from the bridge. The easterly of these white lines, if extended, would have run into the easterly side of the bridge. The easterly edge of the pavement was gradually slanted over to the easterly side of the bridge, reducing the road to two lanes as it crossed the bridge.

A patented bumper railing thirty-four feet long was erected, extending from the southeasterly corner of the bridge at an angle of about forty-five degrees so that its southerly end

was some eight or ten feet easterly from the edge of the pavement. This bumper railing was about three or three and one-half feet high and consisted of a metal strip about a foot wide attached to four 8x8-inch posts. Two red reflector glasses of the type now in common use, each being 4x6 inches, were attached to the bridge end of this bumper rail, and a post between the end of the rail and the bridge was painted white. Another red reflector glass was attached to the south end of the east side of the bridge some five or six feet above the pavement. Above that glass was placed a large sign reading ''Load limit 8 tons, Speed limit 20 miles.'' The sides of the bridge and the bumper rail were all painted with a color known as aluminum. A 250-candlepower arc light was suspended twenty-two feet above the center of the pavement, nineteen feet southerly from the bridge.

The accident happened shortly after midnight on November 2, 1935. The plaintiffs were riding in an automobile driven by the defendant Vezu, the latter's wife being a member of the party. They had visited a night club and later a Mexican cafe in Colton known as ''Little Tiajuana'', and were traveling north toward San Bernardino when the accident occurred. The automobile struck the easterly side of the bridge and stopped on the bridge about twenty feet north of the southerly end. Mrs. Vezu was killed and the plaintiffs were both injured. While there is a conflict as to how much liquor the driver of the car had consumed he admits having taken one drink of whisky and several glasses of beer.

From the testimony of the plaintiffs it appears that the driver of the car had had two glasses of beer and a drink of whisky before they arrived at Colton which was around 11:30 o'clock P. M., that while at Colton he drank four ''beers'' and one drink of whisky, the latter just before they started on the return trip; that while traveling the three miles between Colton and the bridge he drove rapidly and on three separate occasions narrowly averted an accident, twice with other cars and once while crossing a ''dip''; that each time some of his passengers protested and asked him to go slower; that he disregarded these protests and did not diminish his speed; that he was going from 46 to 48 miles an hour when he struck the bridge; that when the car was about 100 feet from the bridge Beckley said to him ''For God's sake turn out''; that he then turned to his left but not far enough

to avoid the side of the bridge; and that just before Beckley warned him he had his head turned toward the right, his wife having just asked him to slow down because Mrs. Beckley, who was riding with her in the rear seat, was "awfully nervous". Mrs. Beckley also testified that she saw the bridge before her husband called out and in her deposition, which was introduced, she testified that she saw the bridge when they were 200 or 300 feet away.

The defendant Vezu testified that he had been traveling along this road from 35 to 45 miles per hour; that as he drove along he had it in mind that there was a bridge some place along there; that he was driving in the right-hand lane and looking ahead; that he did not see the red reflectors; that "I was and I wasn't looking for them"; that he "never noticed" the bumper guard; that he was somewhat blinded by the lights of two cars which crossed the bridge coming toward him before he got there; that he first saw the bridge when he was 75 or 100 feet away; that about the same time he saw it Beckley told him to turn over; that he turned to his left; and that he was going about 40 miles an hour when he collided with the bridge. On cross-examination he testified that he had traveled this road many times; that the bridge had been where it then was for more than fifteen years; that for quite a number of years the pavement had been wider than the bridge; that he knew these facts and knew the relation of the bridge to a point he had just passed; that he was familiar with the highway and the conditions there; that he knew that the white lines marking the traffic lanes terminated about 200 feet south of the bridge; that it was a clear night with no wind or noise; that he was traveling in the right-hand lane just clearing the line; that when that line ended he kept going straight; that two cars "kind of blinded me from seeing the bridge"; that these cars were passing him when he was at a point about 200 feet south from the bridge; that when these cars passed him the bridge showed up; that these cars were fairly close together, one following the other, and that they affected the visibility; that he did not know whether or not he had gotten to the end of the white lines when the second car passed; that when the second car passed there was nothing between him and the bridge; that he saw the bridge when he was from 75 to 100 feet away; that when the lights of the approaching

cars began to bother him he did not reduce his speed or put on his brakes; that he knew when the lights of the second approaching car began to bother him that he was getting in "some close proximity to the bridge"; that when he emerged from the lights of the second car he saw the bridge and Beckley cried out a warning; that the second car passed him "in the vicinity of" the termination of the white lines; and that he was talking to Beckley just before Beckley told him to turn over.

In this action Vezu, the city of San Bernardino and the county of San Bernardino were joined as defendants. The complaint alleges that the defendant city and the defendant county maintained this bridge in a dangerous and defective condition, without providing for or giving any warning of that condition. It is then alleged that the defendant Vezu drove the car without regard for the safety of the plaintiffs and in such a wanton manner as to constitute wilful misconduct, and that the collision was proximately caused by this negligence on the part of the city and county, together with the wilful misconduct of the driver. A jury returned a verdict in favor of the plaintiffs and against the city and county without mentioning the defendant Vezu. A motion for an instructed verdict in favor of the defendant county had been denied. Following the verdict the defendant county filed a motion for judgment notwithstanding the verdict, reserving the right to apply for a new trial if the motion should be denied. That motion was denied but motions for a new trial filed by the county and by the city were granted on the ground of the insufficiency of the evidence. However, the defendant county has taken this appeal from the order denying its motion for judgment notwithstanding the verdict under the authority of section 629 of the Code of Civil Procedure, as that section then read. (See *Barthelmess* v. *Cavalier*, 2 Cal. App. (2d) 477 [38 Pac. (2d) 484].)

It is sought to impose liability upon the appellant county through the Public Liability Act of 1923 (Stats. 1923, p. 675), which imposes liability upon counties for damages resulting from the dangerous or defective condition of streets, highways, and other structures where the governing board of such county, or other officers having authority to remedy the condition, had knowledge or notice of such defects and failed for a reasonable time thereafter to either remedy the condi-

tion or to take such action as was reasonably necessary to protect the public therefrom. In the ordinary case of this nature it is claimed that the accident was caused by the dangerous condition and not by any lack of care on the part of the driver of the vehicle. An unusual situation is here presented where the respondents alleged and tried to prove that the accident resulted not only from the defective condition but from acts on the part of the driver which amounted to willful misconduct. The appellant contends that it is not liable since this bridge and those portions of the traveled or paved part of the highway which are material here were all within the limits of the city of San Bernardino, and that, aside from that question, the evidence does not bring this case within the liability imposed by the statute and is not sufficient to sustain a verdict and judgment as against the county. The respondents contend that the county and city are jointly liable since half of the right of way was outside the city limits, and that the evidence is sufficient to sustain the implied finding of the jury that a dangerous condition existed which proximately contributed to their injuries without negligence on their part. Because of our views on the second of these problems it will be unnecessary to consider the general question of responsibility for the condition of this bridge and its approaches as between the county and city.

The respondents rely particularly on the case of *Adams* v. *Southern Pac. Co.*, 109 Cal. App. 728 [293 Pac. 681], where a widening of the pavement led up to a railroad track and stopped and where no warning signs or barriers were erected. It is also argued that whether the conditions with which we are here concerned were defective and dangerous, and whether adequate warnings were given, are questions of fact which have been passed upon by the jury. The decision in the Adams case is not very helpful under the essentially different facts of this case, where the widened pavement did not abruptly end and where much was done to give warning of the condition and to direct traffic into the narrower entrance to the bridge. Obviously such a situation cannot be as safe as where the bridge is also three lanes wide. The duty owed in such a case is to take reasonable steps for the protection of those lawfully using the highway and to take such action as may be reasonably necessary to warn the public against such dangers as remain. Conceding that there

was a question of fact as to whether a dangerous condition still existed it was incumbent upon the respondents to prove that the driver of this car was using the highway in a proper manner, and that the appellant had notice not only of the existing condition but also of its dangerous character.

We may say here as we said in *Howard* v. *City of Fresno,* 22 Cal. App. (2d) 41 [70 Pac. (2d) 502] :

"Three recent decisions of the Supreme Court seem to be controlling here. (*Nicholson* v. *City of Los Angeles,* 5 Cal. (2d) 361 [54 Pac. (2d) 725] ; *Rodkey* v. *City of Escondido,* 8 Cal. (2d) 686 [67 Pac. (2d) 1053] ; *Whiting* v. *City of National City,* 9 Cal. (2d) 163 [69 Pac. (2d) 990]. See, also, *Beeson* v. *City of Los Angeles,* 115 Cal. App. 122 [300 Pac. 993].) These cases establish the following: ▆ That a municipality is not an insurer against accidents on its streets or property; that it is required to guard against dangerous or defective conditions of which its responsible representatives have actual or constructive notice; that it is not sufficient that the municipal representatives have notice of the condition but that they also must have notice 'of the dangerous character of such condition' (*Whiting* v. *City of National City, supra*) ; that the question of the dangerous character of a defective condition depends largely on the intended lawful use of the property. (*Rodkey* v. *City of Escondido, supra; Beeson* v. *City of Los Angeles, supra.*) "

▆ The respondents alleged that the manner in which the car was driven on this occasion amounted to willful misconduct. They testified to conduct on the part of the driver which, whether or not it constituted willful misconduct, was certainly not consistent with the exercise of reasonable care and caution. If, however, we are to assume that the respondents did not tell the truth and are to take the driver's testimony of what he did as being more favorable to them, this is hardly sufficient to show that he was driving with due care under the circumstances. Although he knew the condition which existed at the bridge, knew its location with respect to a point he had just passed and knew that it was in close proximity, he continued with unabated speed even when he says his vision was obstructed. While he states that he was following the white line which separated the easterly lane from the middle lane he did not notice when that line stopped. After he actually saw the bridge and the bumper

rail he had from 75 to 100 feet in which to move over about the width of his car, with no other traffic approaching and nothing in his way. He says that he was "somewhat blinded" by the lights of two approaching cars although the second of these cars passed him near the end of the white lines, 186 feet southerly from the bridge. It is well known that the lights of an automobile are not ordinarily as blinding on a three-lane highway as when the cars are approaching on a narrower road and that they are not as blinding when coming under large arc lights. It is hard to believe that these approaching lights would prevent his seeing a large bridge and a long guard rail directly in his path, both painted a light color and illumined by a large arc light, and with three red reflector glasses. But if we accept his statement, although the only possible inference from the evidence is that these things must have been visible to other drivers who must have met lighted cars near this bridge during many months' use of this much-traveled road, the facts remain that the driver of this car continued at a high speed when he knew he was somewhere near the bridge, that he made no attempt to slow down when he did see it and that he was then going so fast that he was unable to turn to his left about the width of his car, in a distance from 75 to 100 feet. In our opinion the evidence, taken most favorable to the respondents, discloses that the cause of this accident was the conduct of the driver of this car and the manner in which he drove the same, and the evidence was insufficient to show any such defective condition as would impose liability on the appellant under the statute. (*Rodkey* v. *City of Escondido,* 8 Cal. (2d) 686 [67 Pac. (2d) 1053].)

There was a further failure of proof in that there is no evidence which would support a finding that the appellant had notice that the condition here existing was dangerous for persons properly using the highway. It is not claimed that it had actual notice and respondents must rely upon constructive notice. The real charge is that the conditions of the bridge were not made sufficiently safe for one whose driving amounted to willful misconduct. If, however, the respondents must be permitted to divide their case, and claim as against the county that the driver was proceeding with due care, there is no evidence in the record to support a finding that the appellant had constructive notice that the

existing condition was dangerous for such a driver. Rather unusual precautions had been taken to give warning of the condition, to guide traffic onto the bridge and to protect the public. Whether or not it was possible to do more in this direction the precautions taken had proved sufficient for nearly a year and a half with heavy travel. There is no evidence that any other driver of an automobile ever had an accident because of this condition or that any claim had ever been made. There is no evidence that would tend to bring home to the appellant notice that the warnings given were not sufficient to advise reasonably careful drivers of any possible danger and none to indicate that it should have been known and anticipated that a driver would conduct himself as this one says he did. It follows that the court erred in denying appellant's motion for a judgment notwithstanding the verdict.

The order appealed from is reversed with directions to enter a judgment in favor of the appellant.

Marks, J., and Jennings, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 3, 1938.